UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| KIMBERLYDAWN BORJA REYES, | Case No. 16-cv-06958-LB |
| Plaintiff, | **ORDER DENYING PLAINTIFF'S SUMMARY-JUDGMENT MOTION AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGEMENT** |
| v. | |
| NANCY A. BERRYHILL, | Re: ECF Nos. 15 & 16 |
| Defendant. | |

## INTRODUCTION

Plaintiff Kimberlydawn Reyes seeks judicial review of a final decision by the Commissioner of the Social Security Administration denying her claim for Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act.[1] She moved for summary judgment; the Commissioner opposed the motion and filed a cross-motion.[2] Under Civil Local Rule 16-5, the matter is deemed submitted for decision by this court without oral argument. All parties consented to magistrate-judge jurisdiction.[3] The court denies Ms. Reyes's summary-judgment motion and grants the Commissioner's cross-motion for summary judgment.

---

[1] Summary-Judgment Motion – ECF No. 15. Record citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] Cross-Motion – ECF No. 16.

[3] Consent Forms – ECF Nos. 6, 11.

# STATEMENT

## 1. Procedural History

On February 28, 2013, Ms. Reyes, then age 38, filed a claim for SSI benefits based on depression, anxiety, right-hand weakness, back problems, arthritis, foot pain, hip problems, and head pain.[4] Ms. Reyes's alleged disability onset date is April 1, 2011.[5] On March 14, 2013, R. Augello interviewed Ms. Reyes at a field office and completed a disability report, screening for prior claims.[6] Her claim is similar to a previous claim she filed in February 2010,[7] which the Commissioner and ultimately Administrative Law Judge Richard Laverdure denied in December 2011.[8]

The Commissioner denied her current claim for SSI benefits initially and upon reconsideration.[9] After the appointment of non-attorney advocate Dennis Contreras,[10] Ms. Reyes timely appealed the Commissioner's determination.[11] On May 11, 2015, Administrative Law Judge Mary Parnow (the "ALJ") held a hearing and heard testimony from Ms. Reyes and vocational expert Jo Ann Yoshioka.[12] On August 14, 2015, the ALJ issued an unfavorable decision.[13] The Appeals Council denied Ms. Reyes's request for review of the decision.[14] Ms. Reyes timely filed this action on December 2, 2016[15] and moved for summary judgment.[16]

---

[4] Administrative Record ("AR") 14, 141, 158–59, 246.

[5] AR 160.

[6] AR 265–72.

[7] AR 119, 160.

[8] AR 116–34.

[9] AR 157, 172.

[10] AR 175–76.

[11] AR 191–96.

[12] AR 92–115.

[13] AR 11–28.

[14] AR 1–3.

[15] Compl. – ECF No. 1.

[16] Summary-Judgment Motion – ECF No. 15.

The Commissioner opposed the motion and filed a cross-motion for summary judgment.[17] Ms. Reyes elected not to file a response and submitted the matter.[18]

## 2. Summary of Record and Administrative Findings

### 2.1 Medical Records

#### 2.1.1 Dr. Nefissa Chambi: Primary-Care Physician – Treating

Ms. Reyes was treated by her primary-care physician Dr. Chambi and other healthcare providers at the Permanente Medical Group from April 2010 through July 2011 for a variety of aliments including hypertension, diabetes, common colds, and skin ailments.[19] When Ms. Reyes complained about intermittent pain in her hip, knee, and hand (possibly related to an old injury and "retained metal in [her] pinky finger"),[20] Dr. Chambi ordered hip and hand x-rays that showed no problems with her hips and no metal in her hand.[21] Ms. Reyes felt she could not work and needed "documentation stating that her hand is not normal."[22] Dr. Chambi noted that Ms. Reyes was "[t]rying to get disability; reports that [she] cannot do her regular job (typing) due to old finger injury"[23] and wrote that she discussed the finger issue with Ms. Reyes and said that it was "[n]ot a reason to get disability."[24] Ms. Reyes later said that she was having "serious issues" and thought that Dr. Chambi was "trying to keep her away from seeing the specialist [be]cause you are hidding [sic] something."[25] Dr. Chambi referred Ms. Reyes to an orthopedist, but advised her "that there is no[t] much that they can do for her finger."[26]

---

[17] Cross-Motion – ECF No. 16.

[18] Notice of Submission – ECF No. 17.

[19] AR 390–563.

[20] AR 431.

[21] AR 434.

[22] *Id.*

[23] AR 439.

[24] AR 440–41.

[25] AR 443.

[26] AR 442.

### 2.1.2     Joanne Ramos: Physician's Assistant – Treating

In January 2011, Ms. Reyes saw P.A. Ramos about her pinky finger, hip pain, and lower back pain.[27] P.A. Ramos performed a physical examination and determined that the right hip was "normal."[28] She ordered x-rays of the spine and knee.[29] P.A. Ramos examined Ms. Reyes's left knee in February 2011 and found there was a "slight lateral tilt of the left patella," so she recommended a knee brace and exercises.[30] When Ms. Reyes complained about her knee pain several weeks later, P.A. Ramos referred her to physical therapy.[31]

In November 2011, P.A. Ramos saw Ms. Reyes again and noted that the February 2011 x-ray showed "[e]arly degenerative disc disease at the L4-5 and L5-S1 levels."[32] P.A. Ramos concluded that Ms. Reyes knees had "mild subchondral sclerosis,"[33] but that she had "no swelling, no erythema, no tenderness to palpation, [and] full range of motion. . . ."[34] P.A. Ramos wrote that she did not "see any orthopedic pathology other than patella alta on the left [and] mild degenerative changes in both knees [that] won't explain the pressure-like pain radiating from the hip down the lateral aspect of the lower extremities."[35] P.A. Ramos referred Ms. Reyes to physical therapy.[36]

In November 2012, Ms. Reyes returned and reported lower back pain, knee pain, swelling in her leg and ankle, and chest pain.[37] A November 2012 x-ray showed "some mild degenerative changes in her knees."[38] P.A. Ramos noted that Ms. Reyes was "not a very reliable historian" and

---

[27] AR 447–52.

[28] AR 450.

[29] AR 450–51.

[30] AR 476.

[31] AR 489.

[32] AR 612–13.

[33] AR 613.

[34] *Id.*

[35] *Id.*

[36] *Id.*

[37] AR 903.

[38] *Id.*

United States District Court
Northern District of California

questioned whether her symptoms were "really true."[39] Ms. Reyes was given a cortisone injection for her left knee.[40] In March 2013, when Ms. Reyes asked P.A. Ramos for a note stating that "she is unable to sit or stand due to her hip and knees [*sic*] problem," P.A. Ramos stated she did not "see any reason to restrict her from sitting or standing."[41]

### 2.1.3   Dr. Binh Luu: Spine Specialist – Treating

Ms. Reyes saw Dr. Luu about her lower back pain in November 2011.[42] Dr. Luu found she had early degenerative disc disease; he prescribed physical therapy and ordered an MRI.[43] The MRI revealed "very mild degenerative changes."[44] "There is a mild BB disc bulge at L4-5 that may be leading to mild/subtle lateral recess narrowing."[45] Ms. Reyes received an epidural steroid injection in May 2012.[46] At a follow-up visit, Ms. Reyes complained that the injection did not help, but Dr. Luu did "not recommend any repeat epidural steroid injection."[47]

In March 2013, Ms. Reyes asked Dr. Luu for a note "stating that she is unable to sit and stand due to her back problem."[48] Dr. Luu declined because there were "[n]o restrictions from spine standpoint"; he stated "she only has very mild degenerative changes in her back but this does not prevent her from sitting or standing."[49]

---

[39] *Id.*

[40] AR 903.

[41] AR 1085–86.

[42] AR 623–28.

[43] AR 626.

[44] AR 643.

[45] *Id.*

[46] AR 644 (order), 789–808 (injection procedure).

[47] AR 822.

[48] AR 1086.

[49] *Id.*

### 2.1.4    Dr. Jill Smith Forster: Orthopedic Surgeon – Treating

Ms. Reyes had surgery on her flexor tendon twenty years ago,[50] and she visited the same orthopedic surgeon (Dr. Smith Forster) again in February 2011 because she could not move her right pinky finger well and wanted a "note so she can be declared handicapped."[51] Ms. Reyes could not "state when the finger stopped working."[52] Dr. Smith Forster prescribed a splint and injection, which she found to be partially effective at a follow-up appointment in April 2011.[53] In September 2011, Dr. Smith Forster declined to sign paperwork that Ms. Reyes brought in for her SSI claim because Ms. Reyes had full range of motion in her hand, with the exception of a slight deviation of her pinky that would not prevent her from using her hand, and said that she "see[s] no reason from a hand point of view why this patient cannot be gainfully employed."[54] In March 2013, when Ms. Reyes asked for a disability note, Dr. Smith Forster reported that she had "not seen this patient for several years," but that "[s]he is not a candidate for ssi for her hand and can use it with no restrictions."[55]

### 2.1.5    Dr. Hyeon Choe: Primary-Care Physician – Treating

Ms. Reyes began seeing a new primary-care physician, Dr. Choe, in September 2011 for a "routine check up and exam [but ] . . . mainly to discuss about her SSI application."[56] Dr. Choe noted she had an appointment with orthopedics and did not complete her requested SSI paperwork.[57]

In December 2011, Ms. Reyes called Dr. Choe, reporting depression and anxiety and seeking

---

[50] AR 471.

[51] *Id.*

[52] *Id.*

[53] AR 471–72, 510.

[54] AR 585.

[55] AR 1086.

[56] AR 575.

[57] AR 581.

anti-depressant medication as recommended by her therapist.[58] Dr. Choe also noted that Ms.

Reyes filed for SSI and had been advised to contact her primary-care physician for her "depression

issue." [59] Dr. Choe diagnosed her with major depression, prescribed medication, and referred her

for mental-health services.[60] The next month, Ms. Reyes had another appointment, where Dr.

Choe noted that the 5' 2" Ms. Reyes had lost weight but still weighed 182 pounds and needed to

control her diabetes.[61] Throughout 2012, Dr. Choe, along with other staff at the Permanente

Medical Group, continued to treat her for diabetes, common colds, and skin ailments.[62]

    In September 2012, Ms. Reyes reported experiencing arm pain.[63] Dr. Choe diagnosed her with

"lateral epicondylitis of elbow" (or "tennis elbow") and prescribed rest, exercises, and ibuprofen.[64]

In November 2012, Ms. Reyes visited Dr. Choe about leg and ankle swelling, chest pain, and

numb hands.[65] Dr. Choe gradually lowered her dosage of a diabetes medication, and by April

2013, the swelling had improved significantly.[66] Dr. Choe continued to treat Ms. Reyes for

diabetes, colds, and skin ailments through 2014.[67]

### 2.1.6   Dr. Preston-Hsu and Dr. Lau: Spine Specialists – Treating

    In May 2014, Ms. Reyes had another MRI taken of her spine.[68] The MRI showed "mild

discogenic disease of the cervical spine . . . ."[69] Two physicians in the Spine Clinic at the

---

[58] AR 638.

[59] AR 638.

[60] *Id.*; *see also* AR 646 (noting Dr. Choe's referral for "depression and stress").

[61] AR 663–64.

[62] AR 668–73, 685–726, 731–43, 757–65, 768–88, 809–17, 842–45, 861–63, 913–19, 922–23, 926–1008.

[63] AR 855.

[64] AR 854–60.

[65] AR 896.

[66] AR 896–97, 1107.

[67] AR 1166–69, 1202–08.

[68] AR 1178–81.

[69] AR 1178.

Permanente Medical Group reviewed the MRI with Ms. Reyes.[70] In May 2014, Dr. Preston-Hsu went over the imaging with Ms. Reyes and noted that she had "mild" degenerative disc disease.[71] In October 2014, Dr. Lau discharged Ms. Reyes from the spine clinic, stating, "there is no further management or diagnostic process that [the] spine clinic can offer."[72] Dr. Lau noted that there were "no signs of MRI findings to support [diagnosis] of cervical radic[ulopathy] or lumbar radic[ulopathy]."[73]

### 2.1.7 Anneli Keller: Physical Therapist – Treating

Ms. Reyes had three physical therapy appointments with Anneli Keller to manage chronic pain in October and November 2014.[74] The parties do not address these records, which do not otherwise contain information material to the issues presented, and so the court does not summarize them here.

### 2.1.8 Dr. Daniel Dal Corso: Clinical Psychologist – Treating

In December 2011, Ms. Reyes began seeing psychologist Daniel Dal Corso, who diagnosed her with major depression and adjustment disorder with anxious mood based on her reports of "depression including depressed mood, anhedonia, significant appetite change, decreased energy and decreased concentration."[75] He recommended that she continue taking her antidepressants and going to therapy.[76] He treated Ms. Reyes for depression and anxiety throughout the following year.[77]

In January 2012, Dr. Dal Corso observed that Ms. Reyes had a "hyperverbal rambling

---

[70] AR 1182–90, 1209–14.

[71] AR 1189.

[72] AR 1213.

[73] AR 1213.

[74] AR 1215–17, 1219–21, 1224–26.

[75] AR 645–47.

[76] Id.

[77] AR 679–82, 744–46, 818–20, 836–38, 845–47, 864–66, 869–70.

presentation," possibly from being "overly caffeinated."[78] Dr. Dal Corso noted Ms. Reyes

indicated that "she is currently disabled and not working but not able to answer what her disability

is."[79] In March 2012, Ms. Reyes was "anxious about money" and "somewhat rambling," making it

"hard to track how she's doing."[80] In May 2012, Dr. Dal Corso diagnosed her with "ADD/ADHD"

and noted that Ms. Ramos reported being "calmer" on her medication and received an epidural

three weeks earlier that helped "considerably with [her] pain."[81] In July 2012, Ms. Reyes reported

that she was "feeling calmer" due to her medication but was stressed due to conflicts with

neighbors and a perceived lack of family support.[82] Dr. Dal Corso observed that her "line of

thought [was] somewhat tangential."[83] Dr. Dal Corso "repeatedly encouraged [Ms. Reyes] to make

[an] appointment with [a] Medi-Cal psychiatrist for evaluation/treatment for attention deficit

disorder."[84]

    In September 2012, Ms. Reyes reported that she had made an appointment with a Medi-Cal

psychiatrist.[85] She also noted that she was "feeling very nervous," which she thought was "likely

due to [her] kids starting back to school and having trouble coordinating and keeping up with

everything."[86]

    In October 2012, she reported "ongoing anxiety about not being organized, forgetting things to

---

[78] AR 680.

[79] *Id.*

[80] AR 745.

[81] AR 818–20.

[82] AR 837.

[83] *Id.*

[84] *Id.* The ALJ stated that while "the claimant's treatment providers questioned that she might have had ADHD, there was never a diagnosis or specific treatment." (AR 16.) Dr. Dal Corso and therapist Amy Walker did, however, list a diagnosis of ADD/ADHD. (AR 818, 1135.) But, as acknowledged by the ALJ, Dr. Dal Corso recommended further evaluation, and the record does not reflect what (if any) specific treatment Ms. Reyes received for ADD or ADHD. Because Ms. Reyes does not raise this particular statement by the ALJ or the issue of ADD/ADHD, the court does not consider it as a potential error here. *See Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997) (declining to address arguments not raised in the district court).

[85] AR 846, 865 (confirming appointment scheduled with Dr. Vallas).

[86] AR 846.

do, worry about [her] kids, [and] worry about other relatives saying negative things about her."[87] She had experienced "numbness in the left side and [shortness of breath] for 'about the past week.'"[88] Dr. Dal Corso diagnosed her with "generalized anxiety disorder" and recommended that she call the advice nurse to see if she needed treatment for her physical symptoms.[89]

### 2.1.9   Leslie Zuska: Marriage and Family Therapist – Treating

Ms. Reyes began seeing Ms. Zuska in October 2011[90] to treat her "anxiety, depression, suspiciousness and possibly paranoid ideation about her family members."[91] The record contains chart notes from two therapy sessions in July and September 2013.[92] In July, Ms. Zuska observed that Ms. Reyes's fear, tangential thinking, and incoherence seemed "to be resolving a bit."[93] Ms. Reyes reported that she was working on managing her diet and diabetes.[94]

In September 2013, Ms. Zuska observed that Ms. Reyes was "a bit agitated" but otherwise very involved in her children's education and on top of their homework and other issues.[95] Ms. Zuska noted that Ms. Reyes had a "new level of self-awareness" and coherence, noting during the session that "she stopped herself mid-sentence to say 'let me go back and finish one thought first.'"[96] Ms. Zuska also observed that Ms. Reyes "continues to be unable to sit through a 45 minute session without walking to relieve pain in hip and knee."[97]

---

[87] AR 870.

[88] *Id.*

[89] *Id.*

[90] AR 375.

[91] AR 1114.

[92] AR 1113–18.

[93] AR 1118.

[94] *Id.*

[95] *Id.*

[96] *Id.*

[97] *Id.*

### 2.1.10  Dr. Melissa Vallas: Psychiatrist – Treating

In September 2012, Ms. Reyes saw Dr. Vallas for an initial assessment at Pathways to Wellness after her psychologist, Dr. Dal Corso, referred her to be evaluated for attention deficit hyperactivity disorder.[98] Dr. Vallas found Ms. Reyes had "excessive anxiety affecting relationships" and moderate functional limitations of performing daily activities, maintaining social relationships, and maintaining concentration, persistence, and pace.[99] She described Ms. Reyes as cooperative, euthymic in affect, okay in mood, and having a linear thought process without hallucinations or delusions.[100]

In February 2013, Ms. Reyes saw Dr. Vallas again and complained that her anxiety level was "7-8/10" and she was stressed about her finances.[101] Dr. Vallas found Ms. Reyes had "residual [symptoms] of anxiety bordering on psychosis" and increased her dose of Risperidone.[102] But she also found that Ms. Reyes was cooperative and had good judgment and a linear thought process without hallucinations or delusions.[103]

In March 2013, Ms. Reyes reported to Dr. Vallas that her anxiety was a "6-7/10" and she continued to suffer from panic episodes, excessive worry, and financial strain.[104] Dr. Vallas concluded that Ms. Reyes had "chronic severe anxiety bordering on psychotic" and "residual sleep problems."[105] She prescribed Seroquel instead of Risperidone and kept her on Celexa.[106]

In April 2013, Ms. Reyes reported that she was feeling calmer and less anxious, sleeping better, and having fewer headaches.[107] She said that she was unemployed and applying for SSI.[108]

---

[98] AR 376–82.

[99] AR 380.

[100] AR 379.

[101] AR 388–89.

[102] AR 389.

[103] AR 388–89.

[104] AR 386.

[105] AR 387.

[106] *Id.*

[107] AR 384.

[108] *Id.*

Dr. Vallas made no changes to Ms. Reyes's medications and noted that she should continue to chart her moods and monitor any changes in symptoms.[109]

### 2.1.11 Dr. Soleng Tom: Psychiatrist – Treating

On February 3, 2014, Ms. Reyes returned to Pathways to Wellness, reported a decreased appetite, but denied having panic attacks or insomnia.[110] Dr. Tom examined Ms. Reyes and reported that she was oriented, verbal, polite, and articulate and clinically stable with intact memory, linear thought process and "fair" judgment and insight; he also noted that she was calm, cooperative with normal speech and appropriate affect and that her mood was "euthymic" (normal, non-depressed) "on medication."[111] He recommended that she continue taking Seroquel, Prozac, and clonazepam at her current dosages.[112]

### 2.1.12 Dr. Chris Esguerra: Psychiatrist – Treating

Ms. Reyes saw Dr. Esguerra at Pathways to Wellness from February 2014 to August 2014.[113] On February 20, 2014, Dr. Esguerra reported that she was "calm," "cooperative," and "adequately groomed" with a "normal gait and tone."[114] Ms. Reyes reported subjective symptoms of "debilitating anxiety with all day worry occurring 4–5 days out of the week" and an inability to leave the house due to "racing thoughts" and "feeling under pressure" with "low energy" and "ok" but "variable" sleep patterns.[115] Dr. Esguerra found her speech to be "loud" but her affect to be appropriate, her thought process linear, her thought content to be within normal limits, her memory intact, her judgment good, her attention, concentration, and insight to be fair, and that she

---

[109] AR 385.
[110] AR 1128.
[111] AR 1128–29.
[112] *Id.*
[113] AR 1121–27, 1153–58.
[114] AR 1126.
[115] *Id.*

presented no danger to herself or others.[116] Dr. Esguerra did find that her "Generalized Anxiety Disorder [was] still minimally managed" and adjusted her dosages of Seroquel, Prozac, and clonazepam; he scheduled a follow-up visit in 3 to 6 weeks.[117]

At the follow-up visit on March 11, 2014, Ms. Reyes reported that her anxiety was "up and down" and that she worried a lot about her kids, who were struggling in school and with other issues.[118] She noted that she had been hit recently in the arm by a female student at her son's school and that she sometimes felt like people were against her or going to attack her when she went out in public.[119] Dr. Esguerra found her appearance to be healthy and adequately groomed with a "steady" gait and "good" tone; she appeared "[t]ense," and she was cooperative with normal (but loud) speech.[120] Ms. Reyes's affect was appropriate but she exhibited negative thoughts and had fragmented thought content.[121] Dr. Esguerra found her memory to be intact and her attention, concentration, and judgment to be fair.[122] Dr. Esguerra noted that Ms. Reyes was "struggling with coping with her anxiety, particularly around her kids" and that she needed to continue with therapy, breathing exercises, and her medication.[123] Dr. Esguerra scheduled a follow-up visit in four weeks.[124]

On April 3, 2014, Ms. Reyes reported having two panic attacks a week and continued stress about her children.[125] Ms. Reyes did state that she was doing the breathing exercises (albeit for shorter periods than prescribed) but found it helpful.[126] She also noted that she was sleeping "ok"

---

[116] AR 1126–27.

[117] AR 1127.

[118] AR 1124 (report signed by both Dr. Esguerra and a registered nurse).

[119] *Id.*

[120] *Id.*

[121] AR 1125.

[122] *Id.*

[123] *Id.*

[124] *Id.*

[125] AR 1121.

[126] *Id.*

and eating less, and her energy was "ok."[127] Dr. Esguerra recommended that she continue her medication and therapy regimen and noted that she was cooperative and appropriate in dress, with normal speech and a normal, non-depressed "euthymic" mood and affect.[128] He also noted that Ms. Reyes's thought process was goal-directed with normal content, her memory, insight, judgment, attention, and concentration were all in intact, her gait, muscle strength and tone were all normal, and her fund of knowledge was "average."[129] Dr. Esguerra increased the interval for Ms. Reyes's next follow-up visit to six weeks.[130]

In May 2014, Dr. Esguerra filled out a check-the-box assessment for Ms. Reyes's SSI claim.[131] Dr. Esguerra found slight limitations of her ability to (1) remember locations and work-like procedures, (2) maintain attention and concentration for simple tasks, (3) adhere to a schedule, (4) work close to others without being distracted, and (5) maintain socially appropriate behavior and cleanliness.[132] Ms. Reyes had moderate limitations of her ability to (1) understand and remember both simple and detailed instructions, (2) maintain attention and concentration for detailed tasks, (3) interact appropriately with the public, and (4) work with others without causing distractions.[133] Ms. Reyes had marked limitations of her ability to (1) perform at a consistent pace without an unreasonable number or length of rest periods, (2) handle normal work stress, and (3) accept instructions and criticism.[134] Dr. Esguerra opined that he would expect Ms. Reyes to miss 12 days of work each month as a result of her conditions.[135]

In June 2014, Ms. Reyes saw Dr. Esguerra, reporting "some shortness of breath lately" and

---

[127] Id.

[128] AR 1122.

[129] Id.

[130] AR 1123.

[131] AR 1139–41.

[132] AR 1139–40.

[133] Id.

[134] AR 1140.

[135] AR 1141.

"two panic attacks."[136] She reported that the attacks were "due to worries about her house hunting."[137] Dr. Esguerra noted that Ms. Reyes had "severe [Generalized Anxiety Disorder] with appropriate stress due to housing and medical issues."[138] He recommended that she focus on therapy and work with her primary-care physician to stabilize her shortness of breath and blood sugar.[139] Dr. Esguerra's previous positive exam findings in April 2014 about her appearance, behavior, speech, mood, affect, thought process, judgment, insight, memory, attention, *et cetera* remained unchanged.[140] Dr. Esguerra maintained the interval for Ms. Reyes's next follow-up visit at six weeks.[141]

In August 2014, Ms. Reyes reported she was "dealing with ups and downs" and sometimes still felt overwhelmed "by social stressors," including family and relationship issues, but also was more excited, energetic, and positive.[142] Dr. Esguerra noted that her generalized anxiety disorder was improving, she was "better handling her stressors," therapy had proven "helpful," and her diabetes appeared to better controlled, but she was "not yet ready" to reduce her clonazepam dosage.[143] Dr. Esguerra's previous positive exam findings in April and June 2014 about her appearance, behavior, speech, mood, affect, thought process, judgment, insight, memory, attention, *et cetera* remained unchanged.[144] Dr. Esguerra also increased the interval for Ms. Reyes's next follow-up visit to eight weeks.[145]

There are no records of visits with Dr. Esguerra in 2015, but a letter "created per the request of the addressee," Ms. Reyes, and signed by "Elizabeth Mole, MSN, RN, PMHNP" on January 28,

---

[136] AR 1156.

[137] *Id.*

[138] AR 1157.

[139] *Id.*

[140] *Id.*

[141] AR 1158.

[142] AR 1153.

[143] AR 1154.

[144] *Id.*

[145] AR 1155.

2015 states that Ms. Reyes has been a patient at Pathways to Wellness since September 10, 2012, and is "currently diagnosed with Generalized Anxiety Disorder."[146]

### 2.1.13 Amy Walker: Marriage and Family Therapist – Treating

Ms. Reyes had four therapy sessions with Ms. Walker between March 2014 and May 2014 to treat anxiety, depression, and symptoms of attention-deficit hyperactivity disorder.[147] Ms. Walker found Ms. Reyes had "tangential and disorganized" speech.[148] Ms. Reyes consistently expressed worries and concerns about her family and finances.[149] Ms. Reyes noted that she was not managing her diabetes very well; at one session, she reported that she could not discern whether she was experiencing high blood sugar or anxiety.[150]

In May 2014, Ms. Walker completed a check-the-box report for Ms. Reyes.[151] She found slight limitations of Ms. Reyes's ability to (1) accept instructions and criticism from supervisors and (2) maintain socially acceptable behavior.[152] She found moderate limitations of Ms. Reyes's ability to (1) remember locations and work-like procedures and (2) understand and remember simple and detailed instructions.[153] Ms. Reyes had marked limitations of her ability to (1) handle normal work stress, (2) interact appropriately with the public, and (3) work without distracting others.[154] Ms. Walker identified extreme limitations of Ms. Reyes's ability to (1) maintain attention and concentration for simple and detailed tasks, (2) adhere to a schedule, (3) work close to others without being distracted, and (4) perform at a consistent pace without an unreasonable

---

[146] AR 1227.

[147] AR 1134–35.

[148] *Id.*

[149] *Id.*

[150] AR 1135.

[151] AR 1131–32.

[152] AR 1132.

[153] AR 1131.

[154] AR 1132.

number or length of rest periods.[155]

### 2.1.14 Dr. Carmen Roman: Psychiatrist – Treating

In October 2014, Ms. Reyes saw Dr. Roman at Pathways to Wellness.[156] Ms. Reyes reported still feeling overwhelmed by "social stressors," including mild stress due to "family and relationship concerns," but said that she had more excitement and better energy.[157] Dr. Roman diagnosed her with generalized anxiety disorder but noted that she had been "stable on [her] current medications" and that her "[m]ain issues are related to family stress."[158] Dr. Roman noted that she presented as anxious with rapid/pressured speech and that she was otherwise cooperative, goal-directed, alert, with intact judgment, memory, attention, concentration, and language, with an average fund of knowledge and a normal gait and muscle strength and tone — though Ms. Reyes did report a history of "chronic pain."[159]

### 2.1.15 Mary Ann Vigilanti: State Agency Psychologist – Examining

Dr. Vigilanti evaluated Ms. Reyes's mental status on May 11 and 21, 2010.[160] Dr. Vigilanti conducted the examination in two separate visits "because of the length of time it took to complete one test."[161] Dr. Vigilanti described Ms. Reyes as "hyper verbal with excessive details" and "present[ing] as anxious, almost manic."[162] Dr. Vigilanti noted that Ms. Reyes's "thinking became tangential when responding to some questions, becoming incoherent."[163] Dr. Vigilanti listed diagnoses of anxiety disorder, unknown substance-related disorder (based on prescribed

---

[155] AR 1131–32.

[156] AR 1150.

[157] Id.

[158] AR 1152.

[159] AR 1150–51.

[160] AR 354.

[161] AR 355.

[162] Id.

[163] Id.

medications), and cognitive disorder.[164]

Dr. Vigilanti administered the WAIS-111, Wechsler Memory-111, and Bender-Gestalt Tests.[165] The tests showed Ms. Reyes has a full scale IQ of 78.[166] Dr. Vigilanti found Ms. Reyes could follow simple instructions but might struggle with following through due to confusion.[167] Dr. Vigilanti found that Ms. Reyes would struggle to maintain attendance, work consistently, and maintain concentration.[168] Dr. Vigilanti recommended that Ms. Reyes receive "special and additional supervision" and work "in low stress environments, that are predictable and structured [and] that do not involve decision making or judgment."[169]

### 2.1.16  Dr. Sandra Battis and Dr. J.R. Saphir – Reviewing Physicians

On July 30, 2013, Dr. Sandra Battis, a reviewing physician, found that the evidence supported adopting Ms. Reyes's residual functional capacity as determined by ALJ Laverdure in 2011.[170] She highlighted that Ms. Reyes was limited in handling and fingering with her right hand based on the problem with her right pinkie.[171] On March 10, 2014, Dr. J.R. Saphir reached the same conclusion, noting that there was no additional medical evidence "showing worsening."[172]

### 2.2 Function Report

Louisa Reyes, Ms. Reyes's mother, completed a third-party function report on May 22, 2013.[173] Louisa Reyes described her daughter's routine and daily activities as follows; Ms. Reyes

---

[164] AR 357–58.

[165] AR 355–56.

[166] *Id.*

[167] AR 357.

[168] *Id.*

[169] *Id.*

[170] AR 151–53.

[171] AR 153.

[172] AR 168–69.

[173] AR 292–99.

gets up in the morning and takes her medication before waking up her children and getting them ready for school; sometimes, Ms. Reyes's children wake her up in the morning.[174] Ms. Reyes makes sure that her children are showered, fed, and ready for school and activities (such as church) but sometimes her mother helps out.[175] She is nervous while her children are at school, and "[d]epending on her stress level[,] she may watch TV."[176] When Ms. Reyes is in pain, she sleeps, showers, and "sometimes [ ] forces herself to get up to eat."[177]

Ms. Reyes needs some help with "getting up on the tub" and personal care, but can eat and use the restroom independently.[178] Sometimes she needs to be reminded to take her medicine on time;[179] she needs to take her anxiety and pain medicine to sleep.[180] Ms. Reyes does some chores, but her mother and children help out too by carrying the laundry, sweeping and mopping, and preparing some meals.[181] Ms. Reyes drives and goes to the store, but her mother and children usually accompany her to help unload the groceries; she does not have her own bank account.[182] Ms. Reyes can walk five minutes before taking a 15-minute break.[183] Ms. Reyes spends time with her immediate family, briefly visits with other relatives, goes to church, and meets with her psychiatrist, but she is less outgoing and social than she used to be; she gets nervous and "panicky."[184] Her ability to concentrate and follow instructions "varies" and "depends on her stress level."[185]

Ms. Reyes filled out a function report the same day as her mother, and it is nearly (word-for-

---

[174] AR 292.

[175] AR 293–94.

[176] AR 292, 296.

[177] AR 292.

[178] AR 293.

[179] AR 294.

[180] AR 293.

[181] AR 294.

[182] AR 295.

[183] AR 297.

[184] AR 296–98.

[185] AR 297.

word) identical, and so the court does not summarize it here.[186]

### 2.3 Ms. Reyes's Testimony

At the hearing, Ms. Reyes testified that she was a single, high-school graduate who lived with her mother, brother, sister-in-law, two adult nephews, and four teenage children.[187] Her only income sources were "food stamps and cash aid."[188] She had "problems standing, sitting, and walking" that required shifting every ten minutes to alleviate pain in her back, feet, arm, hip, and leg.[189] She suffered from numbness and imbalance due to diabetes.[190] Ms. Reyes said that she did not have "full control of [her] right hand" because she "cut a tendon muscle."[191]

She suffers from severe depression four to five days a week, and her antidepressants make her tired and disoriented such that she would "lie down a lot, four to six times a day."[192] She has panic attacks five to six days a week that last from one to four hours; during that time, she is short of breath and disoriented.[193] She has difficulty sleeping and addresses it by taking "Tylenol, Codeine 3[,] and Seroquel."[194]

Ms. Reyes's mother and children help her with dressing, laundry, and household chores.[195] When she has severe pain, her mother prepares meals for her children and transports them.[196]

---

[186] AR 300–07.
[187] AR 97–98.
[188] AR 98.
[189] *Id.*
[190] AR 98–100.
[191] AR 101.
[192] AR 103.
[193] AR 103–04.
[194] AR 107–08.
[195] AR 106–07.
[196] *Id.*

**2.4 Vocational Expert Testimony**

Vocational expert ("VE") Jo Ann Yoshioka testified at the hearing.[197] Because Ms. Reyes lacked any recent past relevant work experience, the VE testified based only on hypotheticals.[198] The VE testified that an individual of Ms. Reyes's age, education, and experience could work as a classifier, laundry folder, or housekeeper/cleaner based on the following functional limitations: occasionally lift twenty pounds; frequently lift ten pounds; walk, sit, or stand for six hours in an eight-hour day; occasionally climb, stoop, crouch or crawl; frequently kneel and balance; frequently handle and occasionally finger and push/pull with the non-dominant hand; and rare public interaction.[199]

When Ms. Reyes's advocate asked whether Ms. Reyes could work if she needed to stand or sit "at will," the VE excluded the housekeeper/cleaner job.[200] The VE testified that an individual could not perform any of the three jobs she identified if he or she was limited to simple tasks with additional supervision, was off task 15 percent of the time, or needed to take unscheduled rest breaks throughout the day.[201]

**2.5 Previous Determination of Nondisability**

On February 1, 2010, Ms. Reyes filed an earlier claim for SSI benefits (as distinct from the claim now at issue), which the Commissioner denied initially and upon reconsideration.[202] Administrative Law Judge Richard Laverdure rendered an unfavorable decision that the present ALJ, Mary Parnow, gave great weight in the decision presently under review.[203]

Following the five-step sequential evaluation process, ALJ Laverdure first found Ms. Reyes

---

[197] AR 110–14.
[198] *Id.*
[199] AR 110–11.
[200] AR 114.
[201] AR 113–14.
[202] AR 119.
[203] AR 21 (relying on AR 119–30).

had severe impairments including: "mild degenerative disc disease; obesity; right small finger flexion deformity; anxiety; and depression."[204] He concluded these impairments did not meet the applicable listings, and so he evaluated Ms. Reyes's residual functional capacity ("RFC").[205] ALJ Laverdure found that Ms. Reyes had the RFC to perform light work involving frequent handling, occasional fingering, and occasional pushing or pulling (except with her right upper extremity) with rare public interaction.[206] Because Ms. Reyes could work as a housekeeper/cleaner based on her RFC, ALJ Laverdure concluded that she was not disabled.[207] The Appeals Council denied Ms. Reyes's request for review,[208] and the record does not reflect that she sought judicial review.

### 2.6 Administrative Findings

The ALJ followed the five-step sequential evaluation process and concluded Ms. Reyes was not disabled.[209]

At step one, the ALJ found that Ms. Reyes had not engaged in substantial gainful activity since she filed her application for SSI benefits on February 28, 2013.[210]

At step two, the ALJ found that Ms. Reyes had the following severe impairments: "degenerative disc disease of the lumbar spine, obesity, right small finger flexion deformity, generalized anxiety disorder, [and] depressive disorder."[211] The ALJ found that Ms. Reyes's diabetes and hypertension were non-severe impairments because medication compliance controlled her symptoms.[212] The ALJ found attention deficit hyperactivity disorder was not one of

---

[204] AR 121.

[205] AR 121–23.

[206] AR 123.

[207] AR 129–30.

[208] AR 135–37.

[209] AR 14–23.

[210] AR 16.

[211] *Id.*

[212] *Id.*

Ms. Reyes's impairments because "there was never a diagnosis or specific treatment."[213]

At step three, the ALJ found that Ms. Reyes did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment.[214] Specifically, the ALJ found that Ms. Reyes's hand and back impairments did not meet Listings 1.02 and 1.04.[215] Although the ALJ considered obesity as an aggravating factor, she found no evidence that obesity caused any other severe impairments to meet the listings.[216] The ALJ found that Ms. Reyes's mental impairments — both individually and combined — did not meet Listings 12.04 and 12.06 because Ms. Reyes did not have marked limitations of daily living, social functioning, or concentration, persistence or pace.[217] The ALJ found mild restrictions of daily living, moderate difficulties with social functioning, and moderate difficulties with concentration because Ms. Reyes could prepare meals, drive a car, shop for groceries, attend medical appointments, and help her children with homework.[218]

At step four, to determine Ms. Reyes's RFC, the ALJ followed a two-step process. First, she determined whether Ms. Reyes suffered from an underlying medically determinable physical or mental impairment (i.e. an impairment that could be shown by medically acceptable clinical and laboratory diagnostic techniques) that could reasonably be expected to produce her pain or other symptoms.[219] The ALJ then evaluated the intensity, persistence, and limiting effects of Ms. Reyes's symptoms to determine the extent to which they limited her functioning.[220] The ALJ found that Ms. Reyes's medically determinable impairments could reasonably be expected to cause her symptoms, but that her statements about their intensity, persistence, and limiting effects

---

[213] Id.
[214] AR 17.
[215] Id.
[216] Id.
[217] Id.
[218] AR 17–18.
[219] AR 18.
[220] AR 19.

were not entirely credible.[221] The ALJ found that Ms. Reyes's treating physicians directly contradicted her allegations about her physical ailments,[222] and that Ms. Reyes's claims about the severity of her mental ailments were not supported by the medical records, including her "normal mental status examinations" and the absence of records showing hospitalization.[223] The ALJ concluded that Ms. Reyes had the RFC to perform light work involving frequent handling, occasional fingering, and occasional pushing or pulling (except with her right upper extremity) with rare public interaction.[224]

At step five, the ALJ determined that Ms. Reyes could perform work as a classifier, laundry folder, or housekeeper/cleaner.[225] The ALJ concluded that Ms. Reyes was not disabled.[226]

## ANALYSIS

### 1. Standard of Review

Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the Commissioner if the claimant initiates a suit within sixty days of the decision. A court may set aside the Commissioner's denial of benefits only if the ALJ's "findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal citation and quotation marks omitted); 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). The reviewing court should uphold "such inferences and conclusions as the [Commissioner] may reasonably draw from the evidence." *Mark v. Celebrezze*, 348 F.2d 289, 293 (9th Cir. 1965). If the evidence in the administrative record

---

[221] *Id.*

[222] AR 19–20.

[223] AR 20–21.

[224] AR 18.

[225] AR 22.

[226] AR 23.

supports the ALJ's decision and a different outcome, the court must defer to the ALJ's decision and may not substitute its own decision. *Tackett v. Apfel*, 180 F.3d 1094, 1097–98 (9th Cir. 1999). "Finally, [a court] may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

## 2. Applicable Law

A claimant is considered disabled if (1) he or she suffers from a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (2) the "impairment or impairments are of such severity that he or she is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. § 1382c(a)(3)(A) & (B). The five-step analysis for determining whether a claimant is disabled within the meaning of the Social Security Act is as follows. *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520).

> **Step One.** Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "not disabled" and is not entitled to benefits. If the claimant is not working in a substantially gainful activity, then the claimant case cannot be resolved at step one, and the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(a)(4)(i).

> **Step Two.** Is the claimant's impairment (or combination of impairments) severe? If not, the claimant is not disabled. If so, the evaluation proceeds to step three. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

> **Step Three.** Does the impairment "meet or equal" one of a list of specified impairments described in the regulations? If so, the claimant is disabled and is entitled to benefits. If the claimant's impairment does not meet or equal one of the impairments listed in the regulations, then the case cannot be resolved at step three, and the evaluation proceeds to step four. *See* 20 C.F.R. § 404.1520(a)(4)(iii).

> **Step Four.** Considering the claimant's RFC, is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled and is not entitled to benefits. If the claimant cannot do any work he or she did in the past, then the case cannot be resolved at step four, and the case proceeds to the fifth and final step. *See* 20 C.F.R. § 404.1520(a)(4)(iv).

> **Step Five.** Considering the claimant's RFC, age, education, and work experience, is the claimant able to "make an adjustment to other work?" If not, then the

claimant is disabled and entitled to benefits. *See* 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do. There are two ways for the Commissioner to show other jobs in significant numbers in the national economy: (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart P, app. 2.

For steps one through four, the burden of proof is on the claimant. At step five, the burden shifts to the Commissioner. *Gonzales v. Sec'y of Health & Human Servs.*, 784 F.2d 1417, 1419 (9th Cir. 1986).

### 3. Application

Ms. Reyes does not challenge the ALJ's determination of her impairments at step two or the conclusion at step three that these impairments do not meet the applicable listings. Instead, Ms. Reyes contends that substantial evidence does not support the ALJ's conclusion at step four that she had the RFC to perform light work with certain limitations.[227] Specifically, Ms. Reyes argues that the ALJ improperly weighed (1) the previous finding of nondisability made by ALJ Richard Laverdure and (2) the opinion of treating psychiatrist Dr. Esguerra in his May 16, 2014 assessment ("Esguerra Assessment").[228]

### 3.1 The ALJ Properly Considered the Prior ALJ's Determination of Nondisability

In giving great weight to the prior decision of ALJ Laverdure (finding that Ms. Reyes was not disabled), the ALJ held that Ms. Reyes was not disabled because the "evidence of record did not support any worsening of symptoms of previously found severe impairments and did not support the finding of any new severe impairment in the interim between the prior decision and the instant one."[229] Ms. Reyes argues ALJ Parnow erred because her circumstances in fact changed.

---

[227] AR 18.

[228] Summary-Judgment Motion – ECF No. 15 at 5–11.

[229] AR 21.

"The principals of res judicata apply to administrative decisions, although the doctrine is applied less rigidly to administrative proceedings than to judicial proceedings." *Chavez v. Bowen*, 844 F.2d 691, 693 (9th Cir. 1988). "The claimant, in order to overcome the presumption of continuing nondisability arising from the first administrative law judge's findings of nondisability, must prove 'changed circumstances' indicating a greater disability." *Id.* (internal citation omitted). Changed circumstances include a new impairment or a change in the severity of an existing impairment. *Id.*; *see also Lester v. Chater*, 81 F.3d 821, 827 (9th Cir. 1995). Even if the plaintiff can overcome the presumption of nondisability, prior determinations such as the RFC "are *res judicata* in the subsequent proceeding absent 'new and material' evidence on those issues." *Stephens v. Colvin*, No. 14-CV-02484-YGR, 2015 WL 3430586, at *6 (N.D. Cal. May 28, 2015) (quoting *Chavez*, 844 F.2d at 694).

Ms. Reyes identifies two changed circumstances: (1) mild degenerative disc disease and (2) pain on the right side of her head.[230]

Ms. Reyes argues that her previously diagnosed mild degenerative disc disease is different from her subsequently diagnosed degenerative disc disease.[231] Ms. Reyes does not cite any authority or evidence to support her argument. The Commissioner's disability Listing 1.04 for spine disorders simply references "degenerative disc disease," not "mild degenerative disc disease." *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1. Ms. Reyes does not have a new impairment based upon these terminology differences.

To the extent Ms. Reyes alleges that she experienced a change in the severity of her degenerative disc disease, the record does not support her position. In her summary-judgment motion, Ms. Reyes relies on a new MRI performed in May 2014 as evidence of her "new impairment," but this imaging does not show her condition worsened.[232] A previous 2011 MRI revealed only "mild multi-level degenerative changes,"[233] and the 2014 MRI showed only "mild

---

[230] Summary-Judgment Motion – ECF No. 15 at 11.

[231] *Id.*

[232] *Id.* (citing AR 640, 1177–78).

[233] AR 640.

discogenic disease of the cervical spine . . . ."[234] In 2011 and 2012, Dr. Luu (a spine specialist) noted Ms. Reyes had "very mild degenerative changes"[235] and "very minimal age expected findings . . . ."[236] In 2013, Dr. Luu declined to provide Ms. Reyes with a note she requested; Ms. Reyes stated that "she is unable to sit and stand due to her back problem."[237] Dr. Luu stated that there were "[n]o restrictions from spine standpoint," and that Ms. Reyes "only has very mild degenerative changes in her back" that do "not prevent her from sitting or standing."[238] Dr. Preston-Hsu, another spine specialist, reviewed the 2014 MRI and described Ms. Reyes's degenerative disc disease as "mild"[239] before Dr. Lau discharged her from the spine clinic several months later.[240] In sum, the record does not show the severity of her degenerative disc disease worsened, resulting in changed circumstances for res judicata purposes. *See Chavez*, 844 F.2d at 693.

Ms. Reyes also states that in her "second application[,] [she] claim[s] pain on the right side of the head."[241] She does not elaborate. ALJ Parnow acknowledged that Ms. Reyes "alleged disability due to . . . pain in the right side of the head"[242] but found this was not one of Ms. Reyes's severe impairments at step two of the sequential evaluation.[243] Ms. Reyes does not argue the ALJ erred at step two or identify any evidence of pain on the right side of her head. Moreover, in April 2013, Ms. Reyes told Dr. Vallas she had been experiencing fewer headaches.[244] But while there is one note about headaches, there is little other evidence of head pain generally (inclusive of

---

[234] AR 1178.

[235] AR 643.

[236] AR 822.

[237] AR 1086.

[238] *Id.*

[239] AR 1189.

[240] AR 1213.

[241] Summary-Judgment Motion – ECF No. 15 at 11.

[242] AR 19 (citing AR 274; *see also* AR 141).

[243] AR 16.

[244] AR 384.

headings) or pain on the right side of the head specifically in the medical record. Given these circumstances, Ms. Reyes does not show that her circumstances changed based on pain on the right side of the head. *See id.*

Because Ms. Reyes does not show her circumstances changed and identifies no new and material evidence, she fails to demonstrate that ALJ Parnow erred by giving great weight to the findings and determination of nondisability made previously by ALJ Laverdure. *See id.*

### 3.2 Substantial Evidence Supports the ALJ's Weighing of Dr. Esguerra's Opinion

Although the ALJ "gave some weight to the opinion of [Ms. Reyes's] treating psychiatrist, Chris Esguerra, M.D,"[245] Ms. Reyes argues the ALJ improperly rejected the "more restrictive limitations" in the Esguerra Assessment[246] — including his finding of "marked limitations in her ability to perform at a consistent pace, handle normal stress, and accept criticism from supervisors."[247] The ALJ found that these aspects of the Esguerra Assessment were unsupported "by the evidence of record including the normal mental status examination, and the claimant's ability to drive, shop, and help her children with their homework."[248]

The ALJ is responsible for "'resolving conflicts in medical testimony, and for resolving ambiguities.'" *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014) (quoting *Andrews*, 53 F.3d at 1039). In weighing and evaluating the evidence, the ALJ must consider the entire case record, including each medical opinion in the record, together with the rest of the relevant evidence. 20 C.F.R. § 416.927(b); *see also Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) ("[A] reviewing court [also] must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence.") (internal quotation marks and citation omitted).

"In conjunction with the relevant regulations, [the Ninth Circuit has] developed standards that guide [the] analysis of an ALJ's weighing of medical evidence." *Ryan v. Comm'r of Soc. Sec.*, 528

---

[245] AR 21.

[246] AR 1139–41.

[247] AR 21.

[248] *Id.*

F.3d 1194, 1198 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527). Social Security regulations and case law distinguish among three types of physicians (or other "acceptable medical sources"): (1) treating physicians; (2) examining physicians; and (3) non-examining physicians. 20 C.F.R. § 416.927(c), (e); *Lester*, 81 F.3d at 830. "Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing [non-examining] physician's." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (citing *Lester*, 81 F.3d at 830); *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996).

An ALJ, however, may disregard the opinion of a treating physician, whether or not controverted. *Andrews*, 53 F.3d at 1041. "To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan*, 528 F.3d at 1198 (alteration in original) (internal quotation marks and citation omitted). By contrast, if the ALJ finds that the opinion of a treating physician is contradicted, a reviewing court will only require that the ALJ provide "specific and legitimate reasons supported by substantial evidence in the record." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (internal quotation marks and citation omitted); *see also Garrison*, 759 F.3d at 1012 ("If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence.") (internal quotation marks and citation omitted).

The Ninth Circuit has "held that the ALJ may 'permissibly reject[ ] . . . check-off reports that [do] not contain any explanation of the bases of their conclusions.'" *Molina*, 674 F.3d at 1111 (quoting *Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir. 1996)) (alteration in original). This is because "the regulations give more weight to opinions that are explained than to those that are not." *Holohan*, 246 F.3d at 1202; *but see Popa v. Berryhill*, No. 15-16848, 2017 WL 4160041, at *5 (9th Cir. Sept. 20, 2017) (holding that under the circumstances of that case, a "check-box form" was not a germane reason to reject "other source" evidence).

"If a treating physician's opinion is not given 'controlling weight' because it is not 'well-supported' or because it is inconsistent with other substantial evidence in the record, the [Social Security] Administration considers specified factors in determining the weight it will be given."

*Orn*, 495 F.3d at 631. "Those factors include the '[l]ength of the treatment relationship and the frequency of examination' by the treating physician; and the 'nature and extent of the treatment relationship' between the patient and the treating physician." *Id.* (quoting 20 C.F.R. § 404.1527(d)(2)(i)–(ii)) (alteration in original). "Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided[,] the consistency of the medical opinion with the record as a whole[, and] the specialty of the physician providing the opinion . . . ." *Id.* (citing 20 C.F.R. § 404.1527(d)(3)–(6)); *see also Magallanes v. Bowen*, 881 F.2d 747, 753 (9th Cir. 1989) (ALJ need not agree with everything contained in the medical opinion and can consider some portions less significant than others).

In addition to the medical opinions of the "acceptable medical sources" outlined above, the ALJ must also consider the opinions of other "medical sources who are not acceptable medical sources and [the testimony] from nonmedical sources." *See* 20 C.F.R. § 416.927(f)(1). An "ALJ may discount the testimony" or opinion "from these other sources if the ALJ gives … germane [reasons] … for doing so." *Molina*, 674 F.3d at 1111 (internal quotations and citations omitted).

Here, the ALJ properly assigned little or no weight to the marked limitations in the Esguerra Assessment because they were (1) not supported by Dr. Esguerra's own examination notes (and lacked any explanation reconciling this assessment with his notes), (2) inconsistent with the examination notes from other treating or examining acceptable medical source providers, and (3) inconsistent with Ms. Reyes's level of daily activities and the relatively conservative treatment she has received. The court addresses each reason in turn.

First, the ALJ found that Dr. Esguerra's own treatment notes and clinical records do not support the extent of Ms. Reyes's limitations found in the Esguerra Assessment.[249] While Dr. Esguerra's treatment notes and clinical records do reflect that Ms. Reyes suffers from anxiety and stress, they also show that Dr. Esguerra repeatedly assessed her as cooperative with an average fund of knowledge, appropriate in affect and appearance, with intact memory, euthymic mood

---

[249] AR 21, 1121–27, 1139–41, 1153–58.

(normal, non-depressed), and fair judgment, insight, attention, and concentration.[250] Dr. Esguerra's clinical notes reflect that Ms. Reyes's therapy with her new therapist was going well,[251] her medication adequately managed her symptoms,[252] and she was "better handling her stressors."[253] Dr. Esguerra's clinical notes also reflect Ms. Reyes's subjective reports of feeling overwhelmed by family and financial stressors, but in general, Dr. Esguerra's mental-status examinations remained unremarkable over the course of the treatment relationship.[254] Moreover, in completing the Esguerra Assessment, Dr. Esguerra did not provide any detailed explanation for his check-the-box assessment or attempt to reconcile it with his examination notes.[255] Given these circumstances, the ALJ did not err by giving the Esguerra Assessment less than controlling weight. *See Molina*, 674 F.3d at 1111 (ALJ properly rejected check-the-box report that lacked a supporting explanation and clinical findings); *see also Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005) (holding that even under the heightened "clear and convincing" standard, the ALJ properly discredited a treating physician's opinion when it was not supported by the physician's own clinical notes); *Meanel v. Apfel*, 172 F.3d 1111, 1113–14 (9th Cir. 1999) (affirming an ALJ's discrediting of a treating physician's conclusory and minimally supported medical opinion).

Second, the severity of Ms. Reyes's mental limitations set forth in the Esguerra Assessment is not supported by the treatment notes and clinical records of Drs. Dal Corso, Vallas, Tom, and Roman, who also treated Ms. Reyes. In addition, the ALJ gave great weight to the State agency examining psychologist.[256]

Dr. Dal Corso's notes from visits in 2012, two years before the Esguerra Assessment, reflect

---

[250] AR 1122, 1124–27, 1154, 1157.

[251] AR 1124; *see also* AR 1154 ("therapy helpful").

[252] AR 1124, 1126.

[253] AR 1154.

[254] AR 1122, 1127, 1154, 1157.

[255] AR 1140.

[256] AR 21 (ALJ noted that the State examining psychologist, Dr. Vigilanti, had "opined that [Ms. Reyes] could perform routine one or two step assignments with limited interactions with the general public.") Ms. Reyes does not argue that Dr. Vigilanti's findings support the Esguerra Assessment, which in any event, predated the Esguerra Assessment by four years. *See* AR 354–58.

that Ms. Reyes felt stressed and anxious about relationships with her family and neighbors but also felt calmer on her medication.[257] That same year, Dr. Vallas described Ms. Reyes as excessively anxious but also cooperative, euthymic in affect, okay in mood, and having a linear thought process (without any hallucinations or delusions); Dr. Vallas's assessment did note moderate limitations of Ms. Reyes's daily life, social functioning, concentration and persistence, and undetailed "[e]pisodes of decomposition."[258] Dr. Vallas's subsequent progress notes from 2013, however, reflect that Ms. Reyes continued to have normal mental-status assessments and was improving, noting that she slept better and had fewer headaches and less anxiety.[259]

In February 2014, a few months before Dr. Esguerra completed his assessment, Dr. Tom described Ms. Reyes as oriented, verbal, polite, and articulate and clinically stable with intact memory, linear thought process and "fair" judgment and insight; he also noted that she was calm, cooperative with normal speech and appropriate affect, and her mood was "euthymic on medication."[260]

In October 2014, several months after Dr. Esguerra's assessment, Dr. Roman noted that Ms. Reyes had mild stress due to "family and relationship concerns," but that she had more excitement and better energy.[261] In January 2015, Elizabeth Mole, a nurse at Pathways to Wellness, signed what appears to be a stand-alone form letter stating that Ms. Reyes has generalized anxiety disorder; the letter is not accompanied by an explanation or clinical findings.[262]

In sum, the notes and medical records from Ms. Reyes's treating psychologists and psychiatrists show Ms. Reyes had anxiety and felt stressed, particularly with respect to her children and family relationships. They do not, however, support the severity of the limitations in the Esguerra Assessment because they reflect that Ms. Reyes was managing her anxiety,

---

[257] AR 818–20, 837, 870.

[258] AR 379–80.

[259] AR 384–87.

[260] AR 1128–29.

[261] AR 1150.

[262] AR 1227.

continuously improving, and otherwise presenting with normal mental status.

With respect to the consistency of the Esguerra Assessment and other evidence in the record, Ms. Reyes's therapist, Amy Walker, provided an "other source" medical opinion via a check-the-box report in May 2014.[263] Ms. Walker's report is not wholly consistent with the Esguerra Assessment or with the medical assessments of Ms. Reyes's other "acceptable medical source" treatment providers. While she indicated, like Dr. Esguerra, that Ms. Reyes had a marked limitation of her ability to handle normal work stress, she found that Ms. Reyes had extreme limitations in the area of attention and concentration whereas Dr. Esguerra found those areas to be only slightly or moderately impaired in the Esguerra Assessment[264] (or intact or normal in his clinical examination findings[265] and in the findings of other "acceptable source" treatment providers[266]). Ultimately, the ALJ gave little weight to Ms. Walker's opinion because of its inconsistency with the record and because she is not an acceptable medical source.[267] Although Ms. Reyes points to the cover letter for Ms. Walker's check-the-box report as evidence that Ms. Reyes is disorganized, forgetful, and tangential in her thinking, she does not argue or identify any basis for finding that the ALJ erroneously discounted Ms. Walker's opinion for non-germane reasons. *See Molina*, 674 F.3d at 1111.[268] Moreover, the cover letter does not clearly show what

[263] AR 1131–32.

[264] *Compare* AR 1131–32 *with* AR 1139–40.

[265] AR 1122, 1125, 1127, 1154, 1157.

[266] AR 379, 1129, 1151.

[267] AR 21–22. As previously discussed, an ALJ must consider the opinions of medical sources who are not "acceptable medical sources," but may discount or disregard those opinions for "germane" reasons. *See Molina*, 674 F.3d at 1111. As such, the fact that Ms. Walker may not be an acceptable medical source by itself is not a basis to disregard her opinion. While licensed psychologists qualify as acceptable medical sources, the record does not reflect that Ms. Walker is a licensed psychologist. *See Gomez v. Chater*, 74 F.3d 967, 971 (9th Cir. 1996), *superseded on other grounds as stated in Boyd v. Colvin*, 524 F. App'x 334, 336 (9th Cir. 2013) (mem.). She signed her report (AR 1130–32), not as an "LFMT" or licensed marriage and family therapist, but as an "IFMT." *See Jager v. Barnhart*, 192 F. App'x 589, 591(9th Cir. 2006) (therapists opinion entitled to less weight as an "other source" than opinion from an acceptable medical source). Regardless of whether Ms. Walker is an "acceptable medical source," the ALJ's other reasons for discounting her opinion (e.g., the inconsistency of her opinion with the rest of the medical record, et cetera) are "specific and legitimate" and "supported by substantial evidence in the record" and thus are sufficient. *Reddick*, 157 F.3d at 725.

[268] Summary-Judgment Motion – ECF No. 15 at 8.

United States District Court
Northern District of California

Ms. Reyes asserts that it does. In actuality, Ms. Walker stated that Ms. Reyes's "attendance has been good for the most part" and that she only "occasionally forgets about her appointments."[269] Ms. Walker stated that Ms. Reyes reported forgetfulness and disorganization but also stated that "Ms. Reyes is a delightful and kind client" who "consistently shares examples of how she places the needs of her children above her own . . . ."[270]

Accordingly, the court finds that ALJ's determination — that the medical record, as a whole, is not consistent with the severity of the limitations opined in the Esguerra Assessment — is supported by "specific and legitimate" reasons based on "substantial evidence." *See Reddick*, 157 F.3d at 725.

Finally, the ALJ also gave little or no weight to the Esguerra Assessment because she found the severity of those purported limitations to be inconsistent with Ms. Reyes's daily activities, including her "ability to drive, shop, and help her children with their homework."[271] Ms. Reyes contends that these activities are not necessarily inconsistent with the marked limitations of her ability to perform at a consistent pace, handle normal stress, and accept criticism from supervisors as noted in the Esguerra Assessment.[272]

An ALJ may discredit or discount evidence of disability "when the claimant reports participation in everyday activities indicating capacities that are transferrable to a work setting." *Molina*, 674 F.3d at 1112–13. "Even where those activities suggest some difficulty functioning, they may be grounds for discrediting" evidence in the record. *Id.* at 1113; *see Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001).

Here, it is undisputed that Ms. Reyes participates in day-to-day activities such as shopping, driving, and caring for her children.[273] Ms. Reyes told Dr. Esguerra that she picked her children up

---

[269] AR 1130.

[270] *Id.*

[271] AR 21.

[272] Summary-Judgment Motion – ECF No. 15 at 8–9.

[273] AR 292–95, 1118.

from school and was "focusing on her younger son to help him get through high school."[274] Ms. Reyes's mother wrote that she makes "sure [the children are] fed, showered and ready for school/church or other activities."[275] In September 2013, therapist Leslie Zuska noted that Ms. Reyes "is trying to track each kid's curriculum and homework" and appeared to be "doing better with school LOOP and [ ] to be more on top of her children's issues than in previous years."[276]

The court does not doubt parenting can be a challenging and stressful endeavor, but substantial evidence in the record reflects that Ms. Reyes cared for herself and her children.[277] The record also indicates that Ms. Reyes is able to drive, shop, and appropriately interact with family, treatment providers, school personnel, and others.[278] Here, the inconsistency between the alleged severity of Ms. Reyes's impairments and her daily activities constitutes an additional, "specific and legitimate" reason for discounting the weight given to the Esguerra Assessment. As such, the ALJ did not err by finding these daily activities to be inconsistent with the purported severity of Ms. Reyes's mental limitations as set forth in the Esguerra Assessment.[279]

---

[274] AR 1153.

[275] AR 293.

[276] AR 1118.

[277] AR 292–95, 1118, 1153.

[278] AR 293–95, 1132.

[279] The ALJ also noted that Ms. Reyes's alleged severe mental limitations were not supported by her "fairly conservative treatment with only medication management and therapy" and because Ms. Reyes had not been hospitalized or visited an ER because of her mental-health issues. *See* AR 21. The Ninth Circuit has held that "evidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment." *Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007) (citing *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir.1995)). Whether "medication management and therapy" are sufficiently "conservative" treatments for undermining the severity of a claimant's mental-health impairment does not appear to have been decided by the Ninth Circuit, but it is questionable. *See Goodwin v. Comm'r of Soc. Sec. Admin.*, No. 09-CV-00469-LEK, 2011 WL 4498962, at *5 (D. Haw. Sept. 26, 2011) (finding that ALJ's characterization of mental-health treatment of medication and therapy as "conservative" was inconsistent with the record as a whole); *Merker v. Astrue*, No. 10-CV-4058-JCG, 2011 WL 2039628, at *7 (C.D. Cal. May 25, 2011) (based on "Plaintiff's treatment history of having weekly therapy sessions and using medication, the Court cannot conclude that Plaintiff's treatment was conservative when viewed holistically, and on this record."); *Garcia v. Colvin*, No. 14-CV-00092-AS, 2015 WL 4450901, at *3 (C.D. Cal. July 20, 2015) (court held that ALJ erred in finding Plaintiff's treatment conservative because the court considered biofeedback therapy and Xanax prescriptions as non-conservative treatment) (citing *Parra*, 481 F.3d at 751 (finding "conservative treatment" as "treat[ment] with an over-the-counter pain medication.")). Nevertheless, because the court finds that the ALJ's determination is supported by substantial evidence based on other specific and legitimate reasons, it does not need to make that determination here.

1    Given these circumstances, the court finds that "specific and legitimate reasons" based upon

2    "substantial evidence in the record" support the ALJ's determination that the severity of the

3    limitations in the Esguerra Assessment are not consistent with the record as a whole and are

4    entitled to less than controlling weight. *See Reddick*, 157 F.3d at 725; *see also Tackett*, 180 F.3d at

5    1097–98 (if the evidence in the administrative record supports the ALJ's decision and a different

6    outcome, the court must defer to the ALJ's decision and may not substitute its own decision);

7    *Andrews*, 53 F.3d at 1039–40; *Rollins*, 261 F.3d at 857 (the court will not second-guess the ALJ's

8    reasonable reconciliation of the evidence presented).[280]

## CONCLUSION

10    The court denies Ms. Reyes's summary-judgment motion and grants the Commissioner's

11    cross-motion.

12    **IT IS SO ORDERED.**

13    Dated: September 28, 2017

LAUREL BEELER
United States Magistrate Judge

---

[280] Ms. Reyes does not advance any other arguments in support of her summary-judgment motion or identify any other errors (and she elected not to file a reply to the Commissioner's brief). As such, the court does not consider any other arguments not raised or grounds that are not obvious from the record. *See Sandgathe*, 108 F.3d at 980 (declining to address arguments not raised in the district court); *accord Yang v. Barnhart*, 246 F. App'x 410, 412 (9th Cir. 2007); *Matney ex rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) ("the scope of review of the ALJ's denial of benefits is limited"; declining to consider points raised for the first time on appeal).